IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

MURRILL L. MCLEAN,                    )
                                      )      4:10CV00019
                    Plaintiff,        )
                                      )
v.                                    )      **MEMORANDUM OPINION**
                                      )
PHILIP A. BROADFOOT,                  )
Chief of Police of the City           )
of Danville,                          )
                                      )      By: Jackson L. Kiser
                                      )      Senior United States District Judge
                    Defendant.        )

Before me is a Motion for Summary Judgment filed on March 4th, 2011 by Defendant

Philip Broadfoot, who is the Chief of the Danville Police Department. Mot. for Summ. J., Mar.

4, 2011, ECF No. 12; Def.'s Br. in Supp., Mar. 4, 2011, ECF No. 13. Under the Scheduling

Order issued in this case, the Plaintiff, Murrill McLean, had fourteen days to submit his

response. Pretrial Order 2, June 30, 2010, ECF No. 6 (providing that, "[b]riefs in opposition

must be filed within 14 days of the date of service of the movant's brief…**EXCEPT FOR**

**GOOD CAUSE SHOWN, IF BRIEFS IN OPPOSITION TO THE MOTIONS ARE NOT**

**FIELD, IT WILL BE DEEMED THAT THE MOTION IS WELL TAKEN**") (bold text and

capital letters in the original). Twenty-four days later, the Plaintiff filed a Motion for Extension

of Time to Respond and a Proposed Response. Mot. for Extension, Mar. 28, 2011, ECF No. 16.

Unfortunately, everything beyond the first two pages of the eight page Proposed Response

concerned another case with which Plaintiff's counsel is involved in the Eastern District of

Virginia. See Proposed Resp. 3-8, Mar. 28, 2011, ECF No. 16-1. Furthermore, the Plaintiff

never noticed his Motion for an Extension of Time for a hearing despite being reminded to do so

by the Clerk's Office. The Scheduling Order provides that "[i]t shall be the obligation of the

moving party to bring the motion on for hearing by notice." Pretrial Order 2. Over the next two days, the Defendant filed two Responses in Opposition to the Plaintiff's Motion for an Extension of Time. Def.'s Resp. in Opp'n I, Mar. 29, 2011, ECF No. 19; Def.'s Resp. in Opp'n II, Mar. 30, 2011, ECF No. 20. It was not until April 1st, fifteen days beyond the fourteen day deadline, that the Plaintiff submitted a meaningful Response. Pl.'s Resp., Apr. 1, 2011, ECF No. 21-1. Along with that second Response, Plaintiff's counsel submitted a Reply to the Defendant's two Responses in Opposition. Pl.'s Reply, Apr. 1, 2011, ECF No. 21. On May 5th, 2011 the Court held a hearing on both the Defendant's Motion for Summary Judgment and the Plaintiff's Motions for an Extension of Time. For the reasons explained herein, the Court **GRANTS** the Plaintiff's Motions for an Extension of Time, but **HOLDS** Plaintiff's counsel in civil contempt for his two violations of the Scheduling Order and **IMPOSES A FINE** of **FIVE HUNDRED DOLLARS** upon Plaintiff's counsel. The Court further **GRANTS** the Defendant's Motion for Summary Judgment on the Title VII claim and **DECLINES** to exercise supplemental jurisdiction over the Plaintiff's Virginia Human Rights Act claim.

<u>**FACTS**</u>

This case arises out of a contentious police shooting incident that occurred in the summer of 2009. Compl. 2-3, May 21, 2010, ECF No. 1. The parties agree that on June 8th, 2009, Officer Murrill McLean, the Plaintiff, was attempting to serve warrants at a house in north Danville. Compl. 2; Answer 1, June 30, 2010, ECF No. 4. While doing so, the Plaintiff was approached by a dachshund that had a history of attacking people in the community. Compl. 2; Answer 2. The Plaintiff admits that, in light of the dog's aggressive behavior, he shot the dachshund. Compl. 2; Aff. of Def. 5, Mar. 4, 2011, ECF No. 13-1. An investigation ensued amid rising tension and controversy. Compl. 3; Answer 2. The Defendant initially supported the

Plaintiff, but later changed his position and said that the Plaintiff had acted improperly. Compl. 3; Aff. of Def. 3-5. On July 1st, 2009, the Defendant suspended the Plaintiff with pay and put him on notice of his intent to terminate him. July 1 Letter, Mar. 4, 2011, ECF No. 13-4. On July 10th, 2009, the Defendant terminated the Plaintiff, citing that the Plaintiff's "accounts of the event are factually incorrect and misleading" and his "reasoning for using deadly force was based on [an] overwhelming fear of contracting rabies," which "impairs [his] ability to make sound judgments." July 10 Letter, Mar. 4, 2011, ECF No. 13-5; Compl. 3. It is the details of these incidents over which the two sides disagree.

The first and most major disagreement is over what, exactly, happened on June 8th in north Danville. According to the Plaintiff, while attempting to serve warrants, he "was approached by a vicious dog from an adjacent driveway." Aff. of Pl., Mar. 28, 2011, ECF No. 16-2; Compl. 2. The Plaintiff made verbal attempts to scare the dog away, whereupon "the dog lunged to attack [him]." Aff. of Pl. 2; Compl. 2. The dog apparently "lunged at [him] a second time," prompting the Plaintiff to shoot the dachshund. Aff. of Pl. 2; Compl. 2. The Defendant demands strict proof of the Plaintiff's version of events. Answer 2.

In his affidavit, the Defendant provides more details about the findings made during the course of the investigation. Immediately after the shooting, the Plaintiff's two supervisors, Lieutenant Eanes and Corporal Chivvis, came to the scene. Aff. of Pl. 2. The Plaintiff was instructed to prepare a report of what occurred and Lieutenant Eanes was told to take pictures of the scene. Id. The Plaintiff's first statement indicates that he "pulled into the driveway at the residence and noticed a dog barking in the driveway." Pl.'s First Incident Report, Mar. 4, 2011, ECF No. 13-2. The Plaintiff went to the front door of the house, no one answered, at which time the Plaintiff avers:

> …I turned to go back to my vehicle.  The dog ran up behind me growling and
> lunged as I turned to leave.  I felt certain that if I had hesitated for a moment
> the dog would have attacked and would have been too close to me to shoot.  I
> barely had time to draw my weapon and fire hitting the animal at the foot of
> the steps approximately 2 to 3 feet from me.  It spun once or twice then ran to
> the side of [the residence] where it died.

Id.  The pictures taken by Lieutenant Eanes "depicted a dead dachshund lying on the ground near three wooden steps."  Aff. of Def. 3.  There was no blood on these wooden steps, which were located at the side of the residence.  Id. at 4.

Two days later, on June 10th, both the Plaintiff and another one of his supervisors, Captain Jones, were asked to write detailed reports about the shooting.  Id. at 2.  In that second report the Plaintiff states that the dog was in the neighbor's driveway when he arrived, not the driveway of the residence where he was attempting to serve the warrants.  Pl.'s Second Incident Report, Mar. 4, 2011, ECF No. 13-3.  Upon arrival, the Plaintiff alleges that the following events took place:

> I went up 3 stairs to the front porch, which has trees on both sides of it and
> knocked on the front door.  After waiting a few minutes I decided to leave,
> then from behind me as I turned I heard the growling of a dog at the foot of the
> steps, the animal showed his teeth and hunkered down, I was boxed in, the
> door I was knocking on was behind me and about three feet to the left of me
> another door and wall.  While still standing at the door on the porch that was
> only 6 feet wide, I told it to "get" and it lunged forward towards me to attack.
> I had my metal clipboard with warrants in my left hand and had only seconds
> to un-holster.  The dog was only two to three feet from me at this time and it
> started to lunge towards me and I fired one shot hitting the animal.

Id.  Captain Jones also interviewed the Plaintiff and prepared a report for the Defendant.  Aff. of Def. 3.  The next day, on June 11th, the Defendant returned from a few days' vacation and spoke with the Plaintiff by telephone and reviewed Captain Jones' report.  Id.  Based on the aforementioned two sources, the Defendant believed that the Plaintiff "was trapped and had very little time to react," prompting him to shoot the dog on the residence's wooden side steps.  Id.

The Defendant even admits that "[b]ased on the information provided to me at the time, I publicly supported [the Plaintiff] and his actions."  Id.  The Plaintiff contends that, at this point, the internal investigation ended with the conclusion that he "had acted properly in defending [him]self against an attack by a vicious dog."  Aff. of Pl. 2.  It appears that the Plaintiff would characterize anything beyond this point as "continuous questioning, only to look for a pretext to fire [the Plaintiff]."  Pl.'s Resp. 5, Apr. 1, 2011, ECF No. 21-1.  Whether this difference in labeling creates a genuine issue of material fact is another matter.  See Wards Co., Inc. v. Stamford Ridgeway Assocs., 761 F.2d 117, 210 (2d Cir. 1985) ("[c]ontorted semanticism must not be permitted to create an issue where none exists"); Kinsey v. Cendant Corp., 521 F.Supp.2d 292, 306 (S.D.N.Y. 2007) (semantic distinction was insufficient to create a genuine issue of material fact); Harmon v. Baltimore and Ohio R. Co., 560 F.Supp. 914, 916 (D.D.C. 1983) (same).

Later in the day on June 11th, the Defendant learned from news stories that there was blood on the porch steps of the house at which the shooting occurred.  Aff. of Def. 3.  The Defendant found this odd, since the pictures taken by Lieutenant Eanes showed no sign of blood on the wooden side steps.  Id.  This also seemed to contradict the Plaintiff's first report, in which the Plaintiff averred that he "fire[d] hitting the animal at the foot of the steps approximately 2 to 3 feet from [him]."  Pl.'s First Incident Report.  Perplexed, the Defendant visited the residence the next day, June 12th.  Aff. of Def. 3.  It was at this time that the Defendant saw that the residence had two sets of stairs, one in front with six brick steps and one on the side with three wooden steps.  Id.  The Defendant began to have questions about where the shooting actually occurred at this point, but apparently was unable to meet with the Plaintiff, who was out of the office on National Guard training.  Id. at 4; Aff. of Pl. 2.

The Defendant met with the Plaintiff on June 24th and "specifically sought to clarify the location where the shooting had occurred." Aff. of Def. 4. The Plaintiff told the Defendant that the shooting happened at the front brick steps, not the side wooden steps, as the Defendant originally thought. Id. The Defendant then returned to the residence and spoke with the owner, who showed the Defendant the blood on the lowest step of the front brick steps. Id. The Defendant concluded that the Plaintiff had more space between him and the dog than he reported and that this increased space "offered more time to assess the situation and attempt to diffuse the situation without employing deadly force." Id.

The next day, on June 25th, Officer Brown went to the residence with a crime scene officer on the Defendant's orders. Id. at 5. Officer Brown and the crime scene officer measured the area and took photographs, "which further supported our conclusions of June 24, 2009 that [the Plaintiff] had more time to assess the situation and determine a more appropriate means of response than initially reported." Id. Officer Brown also interviewed the Plaintiff a few days later, on July 1st. Id. The Plaintiff apparently gave Officer Brown two inconsistent accounts of what happened back on June 8th. Id. At the culmination of his investigation, Officer Brown determined that the Defendant "used poor judgment in the decision to shoot the dog" and that the Plaintiff's series of statements were inconsistent. Id. Officer Brown reported these findings to the Defendant and recommended that the Plaintiff be terminated. Id. The Defendant "likewise concluded that terminating [the Plaintiff] was appropriate because [his] accounts of the event were factually incorrect and misleading and his overwhelming fear of contracting rabies interfered with his ability to make sound judgments with regard to the use of force." Id.

Along with the Plaintiff's first attempt to respond to the Defendant's Motion for Summary Judgment, which was itself ten days beyond the deadline, the Plaintiff included an

affidavit. The bulk of the Plaintiff's affidavit appears to have been copied and pasted from the Complaint. <u>Compare</u> Aff. of Pl. 2-3 (paragraphs 6-16) <u>with</u> Compl. 2-3 (paragraphs 8-18). Interestingly, the Plaintiff does not dispute in his affidavit that he gave misleading information to the Defendant during the course of the investigation. The Plaintiff's affidavit also fails to address distance and time to react, key issues which the Defendant discussed at length in his affidavit. Aff. of Def. 3-5. In the Plaintiff's second Response to the Defendant's Motion for Summary Judgment, filed twenty-nine days after the Defendant's Motion, the Plaintiff asserts that the primary material fact in dispute is "whether plaintiff made inconsistent statements during the investigation into the complaint of his shooting of the dog." Pl.'s Resp. 3. The Plaintiff further avers that "[t]he allegation that plaintiff made inconsistent statements was a pretext." <u>Id.</u> This is the extent of the Plaintiff's refutation of the Defendant's allegation that the Plaintiff misled him and his investigators during the internal investigation following the shooting.

Although the Plaintiff does not rebut the Defendant's sworn statement that he gave misleading information during the investigation, he notes that "[n]ever before in the history of the City of Danville Police Department has an officer been terminated after being cleared of any wrongdoing by the Defendant." Aff. of Pl. 2. The Plaintiff further avers that "[n]o action was taken against Lieutenant Eanes, even though [the Defendant] found his report to be erroneous" and points out that Lieutenant Eanes is white. <u>Id.</u> In his affidavit, the Defendant insists that he has terminated six Police Department employees for lying during the course of an internal investigation since becoming chief in May 2003. Aff. of Def. 7. The Defendant further avers that:

> In several of [these] incidents…while the conduct itself may not have been
> egregious on its own, and may have only resulted in a reprimand or time off
> without pay had the employee been forthright about his/her conduct, the fact

> that the employee gave false information during the course of an internal
> investigation or tried to hide the conduct, led to the employee's termination.

Id.  The Defendant has also provided copies of various Police Department regulations, its code of ethics, and its reasons for discipline and dismissal.  Use of Force Policy, Mar. 4, 2011, ECF No. 13-6; Regulations, Mar. 4. 2011, ECF No. 13-7; Code of Ethics, Mar. 4, 2011, ECF No. 13-8; Reasons for Discipline and Dismissal, Mar. 4, 2011, ECF No. 13-9.  All of these documents were either signed by the Plaintiff or provide that the Plaintiff, as an officer, is obligated to familiarize himself with them.  Use of Force Policy 7; Regulations 4; Code of Ethics 1; Reasons for Discipline and Dismissal 1.  According to the Defendant, it was the Plaintiff's poor judgment and lack of candor that resulted in his discharge.  Aff. of Def. 6.  The Plaintiff, by contrast, alleges that the Defendant's "decision to terminate my employment was not based on evidence, but based on racial discrimination."  Aff. of Pl. 3.

Addressing the merits, the Defendant argues that he is entitled to summary judgment because he is not the Plaintiff's "employer" within the meaning of Title VII, rather the City of Danville would be the Plaintiff's Title VII "employer."  Def.'s Br. in Supp. 6-7.  Furthermore, the Plaintiff cannot establish a prima facie case under the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) because he cannot show that he was treated less favorably than disciplined employees from outside the protected class.  Id. at 8-11.  Even if he did establish a prima facie case, the Defendant has articulated a legitimate, non-discriminatory reason for dismissing the Plaintiff.  Id. at 11-14.  As for any claims arising out of the Virginia Human Rights Act, the Defendant reasserts his argument that he is not the Plaintiff's employer and thus cannot be liable under the Act.  Id. at 15-17.

The Plaintiff counters that the Defendant was indeed the Plaintiff's employer, since he was the final decision-maker.  Pl.'s Resp. 4.  The Plaintiff does not respond to the Defendant's

McDonnell Douglas Corp.-based arguments, but instead elects to proceed under the Desert Palace, Inc. v. Costa mixed-motive framework in which the Plaintiff will have to produce at least circumstantial evidence that race motivated the adverse employment action.  Id. at 4-5; Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003).  The Plaintiff claims that he "has put forth, at a minimum, circumstantial evidence of [the Defendant]'s discriminatory intent and that an impermissible factor such as race motivated the adverse employment action."  Pl.'s Resp. at 4. The Plaintiff further concedes that the Defendant has proffered a permissible reason for terminating the Defendant, but alleges that the reason was pretextual.  Id. at 5.  Finally, the Plaintiff argues that by violating Title VII, the Defendant has necessarily also violated the state Human Rights Act.  Id. at 5.

On the issue of the late filings, in the initial Motion for an Extension of Time to Respond the Plaintiff states that he "inadvertently did not note the receipt of Defendant's Motion for Summary Judgment."  Mot. for Extension 1.  He further submits that his Response alleges no new facts and that the "Defendant will not be prejudiced by the granting of the extension."  Id. The Defendant argues that it is well settled that inadvertence does not constitute excusable neglect.  Def.'s Resp. in Opp'n I 2.  Furthermore, the Defendant submits that it would prejudice him for the Court to allow the Plaintiff to violate the deadlines when the Defendant has scrupulously complied with the Scheduling Order.  Id. at 4.  As such, the Defendant asks that his Motion for Summary Judgment be deemed well taken, as provided in the Scheduling Order. Def.'s Resp. in Opp'n II 1; Pretrial Order 2.

In his Reply, Plaintiff's counsel admits that he did not begin preparing his Response to the Summary Judgment Motion until March 27th, nine days beyond the deadline.  Pl.'s Reply 1. Plaintiff's counsel contends that his secretary filed the wrong document the next day.  Id. at 2.

Counsel appears to imply that because Defense counsel responded to his Motion for an Extension of Time in one day, the defense should have ample time to prepare for the motion hearing and will not be prejudiced by the Plaintiff's extraordinarily late filing.  Id.  In mitigation, when the case was first filed Plaintiff's counsel was part of a three person firm.  Id.  Two of those attorneys have since left counsel's firm, leaving him with more cases than he can handle.  Id. at 2-3.  Compounding counsel's problem are his duties as a state senator, which limit the amount of time he can devote to the practice of law.  Id.  Plaintiff's counsel submits that the "Plaintiff should not be penalized because of the transition of his representation."  Id. at 3.

## APPLICABLE LAW

Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); George & Co. LLC v. Imagination Entertainment Ltd., 575 F.3d 383, 392 (4th Cir. 2009).  On a Motion for Summary Judgment, the facts are taken in the light most favorable to the non-moving party, but only insofar as there is a genuine dispute about those facts.  Scott v. Harris, 550 U.S. 372, 380 (2007).  The movant has the initial burden of pointing out to the Court where the deficiency lies in the non-movants's case that would make it impossible for a reasonable fact-finder to bring in a verdict in the non-movants's favor.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A movant-defendant may show that he is entitled to judgment as a matter of law by demonstrating that the non-movant plaintiff could not prove an essential element of his case.  Id. at 322-23.  It is then up to the non-movant to demonstrate to the Court that there are genuine issues of material fact and that he has made a sufficient showing on each of the essential elements of his case.  Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008); Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996).  When the movant provides affidavits and other materials with his

Motion for Summary Judgment, the non-movant must respond with affidavits, deposition testimony, or as otherwise provided in Fed. R. Civ. P. 56(c). Celotex Corp., 477 U.S. at 324; Pension Ben. Guar. Corp. v. Beverley, 404 F.3d 243, 246 (4th Cir. 2005). Mere allegations, denials, references to the Complaint, or oral argument is insufficient to rebut a movant's Motion which is supported by affidavits. Fed. R. Civ. P. 56(e)(2); Berckeley Inv. Group, Ltd. V. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); Beverley, 404 F.3d at 246. "Evidence, not contentions, avoids summary judgment." Al-Zubaidy v. TEK Industries, Inc., 406 F.3d 1030, 1036 (8th Cir. 2005). See also Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651 (7th Cir. 2010) ("the non-moving party is required to marshal and present the court with the evidence [he] contends will prove [his] case"); Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 818 (4th Cir. 1995) (there is no genuine issue of material fact "unless the non-movant's version is supported by sufficient evidence to permit a reasonable jury to find the fact[s] in his favor"). Merely restating the allegations in the Complaint under penalty of perjury, therefore, cannot defeat a properly supported Motion for Summary Judgment. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) ("[t]he object of [Fed. R. Civ. P. 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit") (citing references omitted); Law Enforcement Alliance of Am. v. USA Direct, Inc., 56 Fed.Appx. 147, 148 (4th Cir. 2003) ("[t]he nonmoving party's evidence must be probative, not merely colorable, cannot be conclusory statements…without specific evidentiary support") (internal citing references and quotation marks omitted); Fullman v. Graddick, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of a party's own conclusory allegations is not sufficient to oppose a motion for summary judgment"); Zigmund v. Foster, 106 F.Supp.2d 352, 356 (D.Conn. 2000) ("[a]n affidavit in which the plaintiff merely restates the conclusory allegations of the complaint and denies the truth of the affidavits filed by the

defendants is insufficient to create an issue of fact that would make summary judgment inappropriate") (citing reference omitted).   It should further be noted that legal memoranda do not count as evidence and cannot, without more, create a genuine issue of material fact.  Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1372 (3d Cir. 1996).

The Plaintiff alleges that he was the victim of discriminatory discipline.  There are two ways the Plaintiff can overcome a motion for summary judgment on such a claim.  Martin v. Scott & Stringfellow, Inc., 643 F.Supp.2d 770, 782 (E.D.Va. 2009).  One option is for the Plaintiff to present "direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment action." Tabor v. Freightliner of Cleveland, 388 Fed.Appx. 321, 322 (4th Cir. 2010) (citing Hill v. Lockheed Martin Logistics, 354 F.3d 277, 284 (4th Cir. 2004)).  Where there is no direct evidence of discrimination, the second option is for the Plaintiff to use the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green.  Martin, 643 F.Supp.2d at 782.

Under McDonnell Douglas Corp., the Plaintiff must first make a prima facie case of discrimination.  Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 294 (4th Cir. 2010). The Supreme Court has recognized that the wording of the four-part test is fact specific. McDonnell Douglas Corp., 411 U.S. at 802 n.13.  Where disparate treatment in discipline is at issue, the Fourth Circuit has held that a plaintiff establishes a prima facie case by showing:

> (1) that he is a member of the class protected by Title VII, (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against other employees.

Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993) (citing Moore v. City of

Charlotte, 754 F.2d 1100, 1105-06 (4th Cir. 1985)).  See also Hoyle v. Freightliner, LLC, ---

F.3d---, 2011 WL 1206658, at *11 (4th Cir. 2011).  Once the Plaintiff establishes a prima facie

case of disparate treatment, the "burden of production then shifts to the employer to articulate a

legitimate, non-discriminatory justification for its allegedly discriminatory action."  Merritt, 601

F.3d at 294 (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).  If the

employer is able to do this, the Plaintiff may then demonstrate that the "neutral" reasons offered

by the employer are a pretext for discrimination.  Merritt, 601 F.3d at 294.

## ANALYSIS

### I. The Plaintiff Has Consistently Failed to Follow the Scheduling Order and the Local Rules

Fortunately, this Court is not often confronted with situations where parties file briefs

more than a few days late.  The Plaintiff's Response here, however, is unusually late—fifteen

days late.  The Plaintiff's first Motion for an Extension of Time was filed ten days after the

fourteen day deadline had elapsed.  This first motion was not accompanied by a supporting brief,

as required by the local rules.  W.D.Va. Civ. R. 11(c) (providing that "[b]riefs need not

accompany motions…for an extension of time to respond to or file pleadings, *unless the time has*

*already expired*") (emphasis added).  In the body of the motion, Plaintiff's counsel provided a

five sentence justification for his tardiness by stating that he "inadvertently did not note the

receipt of Defendant's Motion."[1]  Mot. for Extension 1.  Plaintiff's counsel further asserted that

he alleged no new facts, that the Defendant would not be prejudiced, and that his motion should

be granted "to meet the ends of justice."  Id. at 1-2.  He then filed a "Motion for Leave to File the

Correct Response" five days later, which one can assume is also an implicit Second Motion for

---

[1] W.D.Va. Civ. R. 11(c) provides that "a separate brief is not required where a motion itself contains the legal and factual argument necessary to support the motion."  It is debatable whether counsel's Motion falls into this category.

an Extension of Time.  <u>See</u> Pl.'s Reply 1-2 (the first two pages appear to be both a motion and supporting brief for a time extension, setting out the reasons for the untimely Response and why the Court should consider the Plaintiff's Response).

Both the Federal Rules of Civil Procedure and the Supreme Court have made it clear that the criteria the District Court is to use in considering whether to grant an extension depends on whether the motion was made before or after the deadline.  Fed. R. Civ. P. 6(b)(1); <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 895-97 (1990).  When the motion comes after the deadline, as both motions have here, the party filing late must show both good cause and excusable neglect for the untimely filing.  <u>Lujan</u>, 497 U.S. at 896.  District Courts have wide discretion to grant or deny extensions and the Fourth Circuit prefers that matters be resolved on their merits.  <u>Choice Hotels Intern., Inc. v. Goodwin and Boone</u>, 11 F.3d 469, 471-72 (4th Cir. 1993) (preference for resolution on the merits); <u>Marryshow v. Flynn</u>, 986 F.2d 689, 693 (4th Cir. 1993) (broad discretion).  It should be noted, however, that "excusable neglect is not easily demonstrated, nor was it intended to be."  <u>Thompson v. E.I. DuPont de Nemours & Co., Inc.</u>, 76 F.3d 530, 534 (4th Cir. 1996).

Although excusable neglect is a "somewhat elastic concept" and can include negligent oversight, there are limits to what a District Court may accept as excusable neglect.  <u>Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship</u>, 507 U.S. 380, 392-95 (1993).

> The determination of whether neglect is excusable is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission, including the danger of prejudice to the nonmoving party, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

<u>Bredell v. Kempthorne</u>, 290 Fed.Appx. 564, 565 (4th Cir. 2008) (quoting <u>Pioneer Inv. Servs. Co.</u>, 507 U.S. at 395) (internal citing references and quotation marks omitted).  In this case, the

real prejudice cited by the Defendant is the fact that he has complied with the deadlines while the Plaintiff has not, and that this fact should not go unnoticed. Def.'s Resp. in Opp'n I 4. The Plaintiff's delay has been unusually long. In fact, the Defendant correctly points out that it took the Plaintiff longer to respond to the Motion for Summary Judgment than he would have had to answer a complaint. Id. at 3. The original motion hearing date was already within the Scheduling Order's thirty day window between dispositive motion hearings and trial. Pretrial Order 2 ("[a]ll Rule 12 and Rule 56 motions must be heard or submitted on briefs no later than 30 days prior to trial"). Because the Defendant filed his Motion for Summary Judgment far enough in advance, it is unlikely that the Clerk's Office would have had to push the hearing date back any further, even in spite of the Plaintiff's tardiness.[2]

The most important of the excusable neglect considerations is the reason for the untimely filing. Thompson, 76 F.3d at 534. The reason originally offered by Plaintiff's counsel, that he "inadvertently did not note the receipt of Defendant's Motion," does not usually constitute excusable neglect. Pioneer Inv. Servs. Co., 507 U.S. at 392; Thompson, 76 F.3d at 533; Mot. for Extension 1. The fact that Plaintiff's counsel's secretary originally filed the wrong document also falls short of excusable neglect, especially in light of the fact that Plaintiff's counsel admits that he did not begin preparing his Response until nine days after the deadline. Pl.'s Reply 1; Van Horn v. Perrine, No. 90-2142, 1991 WL 4655, at *1 (4th Cir. Jan. 18, 1991) (attempting to blame a secretary's errors for missing deadlines does not establish good cause); Hart v. U.S., 817 F.2d 78, 81 (9th Cir. 1987) ("[s]ecretarial negligence…is chargeable to counsel"). In what might be construed as the Plaintiff's Second Motion for an Extension, Plaintiff's counsel avers that the main reason he needed an extension was because he was busy with his duties in the General

---

[2] The hearing date was in fact moved back by three weeks and the trial by over three months because of scheduling conflicts with Plaintiff's counsel's commitments in the General Assembly, but not necessarily because of his late response.

Assembly.  Pl.'s Reply 3.  This should not be considered a valid reason for the untimely filings, especially since Plaintiff's counsel knew or should have known that the General Assembly would be taking up the issue of redistricting in light of the recent Census.  Key v. Robertson, 626 F.Supp.2d 566, 577-78 (E.D.Va. 2009) (being extremely busy does not qualify as excusable neglect).  See also Shoulders v. U.S. Dept. of Agriculture, 878 F.2d 141, 143 (4th Cir. 1989) (attorney who was a member of the Virginia General Assembly and who missed a deadline to file a claim in federal court could not rely on Va. Code Ann. § 30-5, which gives General Assembly members a continuance of right in state court, to extend the deadline).  Again, this explanation does not justify counsel's failure to move for an extension *before* the deadline.  Counsel's final reason for the delay, that the two other lawyers in his practice left, is certainly a sympathetic one.  Although perhaps a bit cruel, this is not something many courts have considered to be excusable neglect.  See, e.g., Pioneer Inv. Servs. Co., 507 U.S. at 398 ("[w]e give little weight to the fact that counsel was experiencing upheaval in his law practice at the time"); Morris-Belcher v. Housing Authority of City of Winston-Salem, No. 1:04cv255, 2005 WL 1423592, at *4 (M.D.N.C. June 17, 2005) (finding that an attorney's handling cases for a disbarred lawyer and having an unmanageable caseload as a result did not constitute excusable neglect, especially since that attorney failed to explain why he did not move for an extension before the deadline).

   Nonetheless, it has been recognized that District Courts have wide discretion in granting extensions and the appellate courts will only reverse for an abuse of that discretion.  Marryshow, 986 F.2d at 693.  In a fairly recent published opinion, it was noted that "the liberal spirit of the rules…has always been followed in the United States District Court for the Western District of Virginia."  Cornett v. Weisenburger, 454 F.Supp.2d 544, 549 (W.D.Va. 2006).  Fed. R. Civ. P.

16(f)(1)(c) authorizes the Court to impose a wide range of sanctions for non-compliance with the Scheduling Order. The Court's options include not considering the brief or treating the non-compliance as civil contempt meriting a fine. See Nick v. Morgan's Foods, Inc., 270 F.3d 590, 595-96 (8th Cir. 2001) (Fed. R. Civ. P. 16(f) permits a Court to impose a fine payable to the Court); Rutledge v. Town of Chatham, No. 4:10cv35, 2010 WL 4791840, at * 2 (W.D.Va. Nov. 18, 2010) (refusing to consider the pro se plaintiff's untimely brief), aff'd per curiam sub nom. Rutledge v. Roach, No. 10-2310, 2011 WL 755622 (4th Cir. Mar. 4, 2011); Lederer v. Hargraves Tech. Corp., 256 F.Supp.2d 467, 469-70 (W.D.N.C. 2003) (Court refused to consider a party's late response brief where the explanation for the delay was mere inadvertence). In light of the Fourth Circuit's preference that its District Courts resolve cases on their merits, this Court has considered the Plaintiff's Response, but holds Plaintiff's counsel in civil contempt for its very late filing. Choice Hotels Intern., Inc., 11 F.3d at 471-72 (preference for resolution on the merits); Fed R. Civ. P. 16(f)(1)(C); Pretrial Order 1-2 (explaining motion deadlines). The Court further holds Plaintiff's counsel in contempt for his failure to notice his Motion for an Extension of Time for a hearing. Fed. R. Civ. P. 16(f)(1)(C); Pretrial Order 2 (setting out the movant's obligation to notice his motion for a hearing). For these two violations of the Scheduling Order the Court imposes a five hundred dollar fine on Plaintiff's counsel.

## II. The Plaintiff Has Sued a Proper Defendant

Although perhaps more appropriately brought up in a motion to dismiss, the Defendant's preliminary argument in his summary judgment motion is that he is not the Plaintiff's employer for Title VII purposes and thus is not the proper party here. Def.'s Br. in Supp. 6. The Defendant would be correct if this were an individual capacity suit, but it is not. The Defendant cites Huff v. Southwest Virginia Reg'l Jail Auth. for the proposition that the Defendant is the

wrong party regardless of whether he is sued in his individual or official capacity. Def.'s Br. in Supp. 6 n.1 (citing Huff v. Southwest Virginia Reg'l Jail Auth., No. 1:08cv00041, 2009 WL 395392, at *6 (W.D.Va. Feb. 17, 2009)). Specifically, the Defendant appears to rely on a two sentence paragraph from the Huff case which explains:

> The court also is not persuaded by Huff's argument that because these defendants were sued in *both* their individual *and* official capacities, her Title VII claim against them should not be dismissed. This is because the "official capacity" to which Huff refers is exactly the capacity that the Lissau court found insufficient to confer liability under Title VII.

Id. (citing Lissau v. Southern Food Serv., Inc., 159 F.3d 177 (4th Cir. 1998)). The Huff Court only cited Lissau generally for the above proposition. Although Huff is persuasive, it is not binding upon this Court. See Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 430 n.10 (1996) (each district judge "sits alone and renders decisions not binding on the others," even within the same judicial district). In the case at bar, there is no indication that the Plaintiff is attempting to hold Philip Broadfoot personally liable for Title VII violations. For example, in the Complaint the Plaintiff demands a declaratory judgment, compensatory damages of $250,000, other "appropriate reimbursement," and that the Court retain jurisdiction over this matter to ensure compliance with Title VII. Compl. 4. This is not the sort of relief typically sought from an individual defendant. Furthermore, the Complaint notes the Defendant's role as Chief of Police. Compl. 1.

Although the Fourth Circuit has made it clear that supervisors cannot be sued in their individual capacities under Title VII, this does not mean that the Plaintiff in the case at bar has sued the wrong Defendant. Lissau, 159 F.3d at 181. See also Luy v. Baltimore Police Dept., 326 F.Supp.2d 682, 687 (D.Md. 2004), aff'd per curiam, 120 Fed.Appx. 465 (4th Cir. 2005). A supervisor can be a proper defendant in a Title VII suit where he is sued in his capacity as an

agent of the employer. See Hinson v. Clinch Cnty. Bd. of Educ., 231 F.3d 821, 827 (11th Cir. 2000) ("[t]he only proper individual defendants in a Title VII action would be supervisory employees in their capacity as agents of the employer"); Malone v. Shenandoah Cnty. Dept. of Soc. Servs., No. 5:04-cv-114, 2005 WL 1902857, at *2 (W.D.Va. Aug. 9, 2005) (noting that, in Title VII suits, Lissau only stands for the proposition that supervisors cannot be sued in their individual capacities and hinting that this would not preclude official capacity suits, but ultimately deciding the issue on other grounds); Zakeri v. Oliver, 19 F.Supp.2d 553, 556 (E.D.Va. 1998) (although the Fourth Circuit has not decided the issue, other circuits have held that a plaintiff can recover under Title VII by naming supervisors as agents of the employer). While this is not precisely the same principle as the individual/official capacity distinction for the purposes of sovereign immunity or § 1983 claims, it is its conceptual blood brother. Compare Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991) (discussing the relationship between official and individual capacity in the context of lawsuits brought under both 42 U.S.C. § 1983 and Title VII and concluding that "[w]e think the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly") with Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989) (for Eleventh Amendment purposes, a suit against a state official in his official capacity is "no different from a suit against the State itself) and Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (in a § 1983 claim, an official capacity suit is "an action against an entity of which an officer is an agent" and "the real party in interest is the entity") (citing references omitted).

The Defendant offers another case from this District, Session v. Anderson, for the proposition that the individual/official capacity distinction is one without a difference for the

purposes of Title VII. <u>Session v. Anderson</u>, No. 7:09cv138, 2010 WL 519839, at *2 (W.D.Va. Feb. 11, 2010). In <u>Session</u>, a plaintiff brought a Title VII claim against a county school board and the superintendent of the county schools in her official capacity. <u>Id.</u> at *1. The Court dismissed the claim against the superintendent, finding that she was not the plaintiff's employer under Title VII. <u>Id.</u> at *2. In <u>Session</u>, as in <u>Malone</u>, the county board or department was a named defendant and so remained after the Court dismissed the claims against the supervisor. <u>Compare</u> <u>Session</u>, 2010 WL 519839, at *1 <u>with</u> <u>Malone</u>, 2005 WL 1902857, at *2. The <u>Malone</u> Court best explained the rationale behind its ruling when it commented that "the Title VII claim against [the supervisor], in his official capacity, is redundant and may be dismissed since the claim is also asserted against [the county department]." <u>Malone</u>, 2005 WL 1902857, at *2. Since the Plaintiff's agent/official capacity suit is, in essence, an action against the City of Danville, the Plaintiff has sued a proper defendant.

<u>III. The Plaintiff Has Produced No Evidence That His Discharge Was Racially Motivated</u>

In his Response, the Plaintiff makes no mention of burden-shifting, but instead asserts that he "has put forth, at a minimum, circumstantial evidence of [the Defendant]'s discriminatory intent and that an impermissible factor such as race motivated the adverse employment decision." Pl.'s Resp. 4. This is the mixed motive language from <u>Desert Palace, Inc.</u>, 539 U.S. at 101-02. Before discussing the evidence the Plaintiff has put forth, it is useful to review what constitutes "circumstantial evidence" under <u>Desert Palace</u> and its Fourth Circuit counterpart, <u>Hill v. Lockheed Martin Logistics Management, Inc.</u>, 354 F.3d 277 (4th Cir. 2004). No matter the theory under which the Plaintiff proceeds:

> ...the ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination. To demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon

a protected trait must produce sufficient evidence upon which one could find that the protected trait actually motivated the employer's decision. The protected trait must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.

Hill, 354 F.3d at 286 (internal citing references, quotation marks, and punctuation omitted). See also Adams v. The Trustees of the Univ. of N.C. Wilmington, ---F.3d---, 2011 WL 1289054, at *7 (4th Cir. 2011). To be clear, Desert Palace and Hill did not give plaintiffs the option of proceeding under a truncated version of McDonnell Douglas whereby they could survive summary judgment simply by establishing a prima facie case. Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 317-18 (4th Cir. 2005). If that were so, no plaintiff would present his Title VII claim under the McDonnell Douglas framework because there would be a much easier option available to him. Id. at 319 n.5 (Desert Palace did not nullify McDonnell Douglas). By way of example, courts have found that plaintiffs have proffered circumstantial evidence of racial motives where the plaintiff has offered statistics, racially charged comments in connection with employment, or even suspicious timing in the context of unlawful retaliation cases. Austin v. Rappahannock Area Alcohol Safety Action Program, No. 3:09cv200, 2009 WL 3669734, at *2 (E.D.Va. Nov. 4, 2009) (comments and suspicious timing); Mulvey v. Bellsouth Telecommunications, Inc., No. 2:08-3547, 2010 WL 3782852, at *11 (D.S.C. July 12, 2010) (suspicious timing); Martin v. Alumax of South Carolina, Inc., 380 F.Supp.2d 723, 735-36 (D.S.C. 2005) (comments); E.E.O.C. v. Jordan Graphics, Inc., 769 F.Supp. 1357, 1383 (W.D.N.C. 1991) (statistics).

As evidence of racial motives, the Plaintiff points to his assertion that "he was investigated by his immediate supervisor and was cleared of any wrongdoing" and that "[i]t was only after some time, did [the Defendant] subject [the Plaintiff] to continuous questioning, only to look for a pretext to fire [the Plaintiff]." Id. at 5. Both parties admit that the Defendant

continued looking into the shooting after this point, but the Plaintiff appears to contend that this was not an "investigation" but rather "continuous questioning…to look for a pretext."  <u>Compare Id.</u> at 5 <u>with</u> Aff. of Def. 6.  Both parties also agree that the Defendant initially supported the Plaintiff's actions in the shooting, but later, after further "investigation"/"continuous questioning," the Defendant switched his position.  <u>Compare</u> Aff. of Pl. 2-3 <u>with</u> Aff. of Def. 3-6.  It is the agreement over the substance of what occurred, not the artificial difference in labeling, that matters here.  <u>See</u> <u>Wards Co., Inc.</u>, 761 F.2d at 210; <u>Kinsey</u>, 521 F.Supp.2d at 306; <u>Harmon</u>, 560 F.Supp. at 916.

The Defendant devotes three pages of his affidavit to explaining the reason for his change in positions.  Aff. of Def. 3-6; <u>Hill</u>, 354 F.3d at 293 (in a discriminatory discipline case, the Court must look at the facts as they appeared to the person making the decision to discipline).  <u>See also</u> <u>Gibson v. Fluor Daniel Servs. Corp.</u>, 281 Fed.Appx. 177, 179 (4th Cir. 2008) ("an employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct") (citing references omitted).  Based on the information available to him the day he returned from vacation, the Defendant supported the Plaintiff.  <u>Id.</u> at 2-3.  Later that same day, however, the Defendant began to second guess his decision.  <u>Id.</u> at 3.  Over the course of the next two and a half weeks, the inquiry into the shooting continued, during which time the Defendant met with the Plaintiff to question him about the incident, directed a group of officers to conduct an internal investigation, and twice visited the residence where the shooting took place.  <u>Id.</u> at 3-5.  At the culmination of this inquiry, the Defendant believed he made a mistake in initially supporting the Plaintiff.  <u>Id.</u> at 5.

The Plaintiff, on the other hand, asserts that "[a]fter a thorough and complete investigation," Lieutenant Eanes "concluded that I had acted properly."  Aff. of Pl. 2.  "Some

time after that, complaints were made regarding the shooting," including one by a city councilman. Id. At the hearing, Plaintiff's counsel commented that "it was okay until there was a public furor about it." The Plaintiff specifically alleges that because of that pressure, the Defendant changed his position, found Lieutenant Eanes' investigation to be erroneous, and "stated publicly that [the Plaintiff] had not acted properly." Id. This resulted in the Plaintiff being discharged "after being cleared of any wrongdoing by the Defendant" while Lieutenant Eanes, who is white, was not punished at all, "even though [the Defendant] found his report to be erroneous." Id. at 3. For the purposes of comparing disciplinary action to establish pretext or discriminatory motive, however, innocently proffering a report that turns out to be erroneous differs significantly from providing intentionally misleading information.[3] Bell v. Town of Port Royal, 586 F.Supp.2d 498, 510-13 (D.S.C. 2008) (terminated police officer did not offer sufficient circumstantial evidence under Hill where he showed other officers were disciplined differently, but those officers had not engaged in the same type of misconduct as the terminated officer). Courts consistently find that an employee who intentionally gives misleading information to his employer has not met his employer's expectations and has given the employer a legitimate, non-discriminatory reason to terminate the employee. See Garrett v. Langley Federal Credit Union, 121 F.Supp.2d 887, 901 (E.D.Va. 2000) (lying to one's employer is a legitimate, non-discriminatory rationale for terminating employment); Anderson v. Duke Energy Corp., No. 3:06cv399, 2008 WL 4596238, at *11 (W.D.N.C. Oct. 14, 2008) (dishonest employee was not meeting her employer's legitimate expectations).

Not only has the Plaintiff failed to rebut the Defendant's assertion that he intentionally provided misleading information during the internal investigation, the Plaintiff almost concedes

---

[3] From the Defendant's Affidavit, it appears that the reason Lieutenant Eanes' report and photographs were erroneous was because the Lieutenant was getting his information from the Plaintiff. See Aff. of Def. 2-3.

the point implicitly.  See Aff. of Pl. 3 ("No action was taken against Lieutenant Eanes, even though [the Defendant] found his report to be erroneous").  When confronted with this at the hearing, Plaintiff's counsel insisted that although the Plaintiff never denied the Defendant's allegation in his affidavit, he never admitted it either.  At any rate, Plaintiff's counsel advised that the Plaintiff was, as of the hearing, denying that he misled the Defendant.  Under Fed. R. Civ. P. 56(e), however, this denial in oral argument is too little too late.  Berckeley Inv. Group, 455 F.3d at 201; Beverley, 404 F.3d at 246.

The Plaintiff avers that it was only after "some time" that the Defendant subjected him to "continuous questioning," but the Plaintiff admits that, following the shooting, he was out of the office for training and does not dispute that he was unavailable to meet with the Defendant at that time.  Aff. of Pl. 2 (out on training); Aff. of Def. 4 (the Plaintiff was deployed with the National Guard for two weeks when the Defendant returned to the office on June 11th).  Furthermore, although the Plaintiff characterizes the questioning as "continuous," he offers no other instances of questioning after Lieutenant Eanes' investigation aside from the two in late June/early July, which were a week apart from one another.  Aff. of Def. 4-5.  Although doubtful, the Plaintiff may have offered sufficient circumstantial evidence that pressure from local politicians possibly played a role in the Plaintiff's discharge.  Aff. of Pl. 2 (city councilman publicly complained about the shooting at a City Council meeting and "[s]ubsequent to pressure placed on him by certain individuals, defendant stated that the investigation was erroneous and stated publicly that [the Plaintiff] had not acted properly").  But see Hill, 354 F.3d at 291 ("an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision"); Cruz v. Town of South Boston, No. 4:06cv1, 2006 WL 3760140, at *4 (W.D.Va. Dec. 19, 2006) ("the burden rests on the

plaintiff to prove that the person who allegedly acted with discriminatory intent was the actual

decisionmaker") (Kiser, J.). Most importantly, however, he has offered no evidence whatsoever,

circumstantial or direct, that race was a motive in his termination. As the Defendant astutely

points out, termination because of political pressure, while certainly unfair, is not actionable

under Title VII. Hill, 354 F.3d at 286 (the protected trait must have motivated the adverse

employment action); Def.'s Br. in Supp. 14.

### IV. The Plaintiff Has Not Made a Prima Facie Case Under McDonnell Douglas

In light of the Plaintiff's failure to produce any evidence that race was a motivating factor

in this disciplinary action, his second option would be to use the burden-shifting method of the

McDonnell Douglas case. Laber v. Harvey, 438 F.3d 404, 430 (4th Cir. 2006); Martin, 643

F.Supp.2d at 782. Although the Plaintiff's briefs appear to indicate that he is proceeding under

the mixed motive framework, at the hearing the Plaintiff seemed to abandon the mixed motive

framework in favor of the burden-shifting framework. In an effort to give the Plaintiff the

benefit of the doubt, then, the Court includes an analysis under McDonnell Douglas.

Unfortunately, the Plaintiff is unable to establish a prima facie case using the discriminatory

discipline test the Fourth Circuit formulated in Cook v. CSX Transp. Corp. and invoked very

recently in Hoyle v. Freightliner, LLC. Hoyle, ---F.3d---, 2011 WL 1206658, at *11; Cook, 988

F.2d at 511.

There is no question that the Plaintiff meets the first of Cook's three prongs. Cook, 988

F.2d at 511 (first element is that the Plaintiff is a member of a protected class). As to the second

prong, the Plaintiff contends that the six other instances in which the Defendant has terminated

employees for dishonesty during an internal investigation were not comparable in seriousness to

the Plaintiff's situation. Id. Of those six employees, five were white and one was black. Aff. of

Def. 7.  Their underlying misconduct included sending harassing e-mails, alerting a citizen that the police had obtained a search warrant for his property, taking money from an office collection, covering up a single car accident involving a police cruiser, and providing false information in reports of investigation.  Id.  At the hearing, the Plaintiff attempted to take the focus off of whether he lied to the Defendant by arguing that the underlying conduct mentioned above is "criminal" and significantly more serious than shooting a dog.  While the argument that sending harassing e-mails or covering up an accident involving a police cruiser is more grievous than shooting someone's pet is astounding, it also fails to address the real issue here—lying to a boss or supervisor about a work-related matter.  The Defendant acknowledges that:

> In several of the incidents above, while the conduct itself may not have been egregious on its own, and may have only resulted in a reprimand or time off without pay had the employee been forthright about his/her conduct, the fact that the employee gave false information during the course of an internal investigation or tried to hide the conduct, led to the employee's termination.

Id.  As to both underlying conduct and, more importantly, attendant dishonesty, the Court finds that the Plaintiff's misconduct is at least as serious as the six prior instances offered by the Defendant, if not more serious than a few of them.  See Tabor, 388 Fed.Appx. at 322 ("precise equivalence in culpability between employees is not the ultimate question…comparison can be made in light of the harm caused or threatened to the victim or society, and the culpability of the offender") (citing reference omitted); Cook, 988 F.2d at 511 (holding that only discipline imposed for like offenses should be compared and noting "the reality that the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances") (citing reference omitted).  It should also be noted that this is not a case where the Defendant has changed his justification for the termination at any point.  Compare July 1 Letter 1 with Aff. of Def. 6.  See also E.E.O.C. v. Sears Roebuck

and Co., 243 F.3d 846, 852-53 (4th Cir. 2001) (the fact that an employer has given shifting

explanations for an adverse employment action is generally probative of pretext). The Plaintiff

offers one more instance of employee misconduct, specifically that the Defendant found

Lieutenant Eanes' internal investigation report to be erroneous. Aff. of Pl. 3. As discussed

above in Section III, Lieutenant Eanes' conduct, if it could even be characterized as misconduct,

was not comparable in seriousness to the Plaintiff's.

For the six instances of discipline that were similar to the facts in this case, the Plaintiff

cannot meet Cook's third prong, "that the disciplinary measures enforced against him were more

severe than those enforced against those other employees." Hoyle, ---F.3d---, 2011 WL 1206658,

at *11; Cook, 988 F.2d at 511. Those six other employees were fired, just like the Plaintiff.

Aside from the aforementioned Lieutenant Eanes incident, the Plaintiff offers no other instances

of misconduct where the sanction imposed by the Defendant was any different. The Plaintiff has

therefore failed to establish a prima facie case of discriminatory discipline.

V. The Plaintiff Has Not Shown That the Proffered Reason for the Discharge Was a Pretext

The Defendant admits that he initially supported the Plaintiff, but upon further

investigation he changed his position. Aff. of Def. 3-5. The Plaintiff contends that the

Defendant's explanation of that change in position, that further inquiry showed that the Plaintiff

had misled the chief and his officers about what occurred, is a pretext for discrimination. Pl.'s

Resp. 5. Progressing to the pretext analysis presumes, of course, that the Plaintiff has made a

prima facie case under McDonnell Douglas, which he has not done.[4] Cook, 988 F.2d at 511.

---

[4] The pretext analysis is only applicable to cases using McDonnell Douglas' burden-shifting framework. See
Diamond, 416 F.3d at 318 (distinguishing the two tests). Because the Desert Palace-style cases require some
showing of discriminatory motive at the outset, a separate pretext inquiry would be redundant under that mixed-
motive framework.

There is no question that the reason the Defendant offers, that the Plaintiff intentionally misled him, is an acceptable, race-neutral explanation. <u>Garrett</u>, 121 F.Supp.2d at 901. Assuming for the sake of discussion that the Plaintiff has established a prima facie case under <u>McDonnell Douglas</u>, he has still failed to demonstrate race-based pretext. The key question is whether the Plaintiff has offered any evidence that the Defendant did not believe that the Plaintiff intentionally misled him when he made the decision to terminate the Plaintiff. <u>Holland v. Washington Homes, Inc.</u>, 487 F.3d 208, 215 (4th Cir. 2007). The Plaintiff offers some evidence that the Defendant decided to fire him after the City Council pressed the issue of the shooting, prompting the continuing inquiry to look for a reason for dismissal. Aff. of Pl. 2-3. Although probative of termination because of political pressure, this evidence has nothing to do with firing the Plaintiff because of race discrimination. To show pretext, it is incumbent upon the Plaintiff to show that the Defendant's explanation is a pretext *for discrimination*. <u>See</u> <u>Bonds v. Leavitt</u>, 629 F.3d 369, 386 (4th Cir. 2011) (Title VII plaintiffs must show that the defendant's reasons for the adverse employment action "were not the actual reasons…giv[ing] rise to a reasonable inference that [the protected trait] was the real reason"); <u>Love-Lane v. Martin</u>, 355 F.3d 766, 788 (4th Cir. 2004) (stressing that the pretext must be related to the defendant's protected trait). Merely showing that the Defendant has proffered *some sort* of pretext is insufficient in a Title VII case. <u>Love-Lane</u>, 355 F.3d at 788.

The Plaintiff also offers the example of Lieutenant Eanes as evidence of pretext. Aff. of Pl. 3. As discussed in Section III, Lieutenant Eanes' conduct was not comparable to the Plaintiff's, thus the lack of disciplinary action against the Lieutenant cannot help the Plaintiff establish a pretext for discrimination. <u>Bell</u>, 586 F.Supp.2d at 510-11 (under <u>McDonnell Douglas</u> framework, terminated police officer's evidence that two other officers were not disciplined as

harshly did not demonstrate pretext where the conduct of the other two officers was not comparable to that of the terminated officer).

VI. The Court Declines to Exercise Its Supplemental Jurisdiction Over the Virginia Human Rights Act Claim

In addition to his Title VII claim, the Plaintiff alleges that the conduct of which he complains violates the Virginia Human Rights Act. Va. Code Ann. § 2.2-3901. Specifically, "an employer's violation of a federal statute or regulation prohibiting discrimination is an unlawful practice under Virginia law." Pl.'s Resp. 5. See also Grimes v. Canadian Am. Transp., Inc., 72 F.Supp.2d 629, 634 (W.D.Va. 1999) ("[t]he VHRA essentially makes any federal violation a violation of Virginia law as well") (Kiser, J.). Having determined that the Defendant is entitled to summary judgment on the Title VII claim, the Court does not need to address the possibility that the Defendant violated the state Human Rights Act. The Plaintiff's Title VII claim invokes this Court's federal question jurisdiction. Graham v. Frank, No. 88-3196, 1989 WL 100668, at *1 (4th Cir. Aug. 28, 1989). When the case was filed, both parties were Virginia residents, which precludes them from invoking the Court's diversity jurisdiction. 28 U.S.C. § 1332; Civil Cover Sheet, May 21, 2010, ECF No. 1-1 (showing that both parties are residents of the City of Danville). Without the Title VII claim, then, the Plaintiff has no means of keeping his claim in federal court. See Waybright v. Frederick Cnty., 528 F.3d 199, 209-210 (4th Cir. 2008) (District Court properly declined to exercise supplemental jurisdiction over state law tort claims once it granted summary judgment to the defendants on the federal claims).

## CONCLUSION

The Court **GRANTS** the Plaintiff's Motions for an Extension of Time, but **HOLDS** Plaintiff's counsel in **CIVIL CONTEMPT** for his two violations of the Scheduling Order and

**IMPOSES A FINE** of **FIVE HUNDRED DOLLARS** upon Plaintiff's counsel.  Because the Plaintiff has neither offered any evidence of race discrimination nor established a prima facie case, the Court **GRANTS** the Defendant's Motion for Summary Judgment on the Title VII claim and **DECLINES** to exercise supplemental jurisdiction over the Plaintiff's Virginia Human Rights Act claim.  The Clerk of the Court is directed to **DISMISS** this case from the docket.

ENTERED this 13th day of May, 2011.

s/Jackson L. Kiser
Senior United States District Judge